NOT DESIGNATED FOR PUBLICATION

No. 123,623

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STACY JEAN GOMEZ,
*Appellant*,

v.

KANSAS DEPARTMENT OF REVENUE,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Opinion filed March 25, 2022.
Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Donald J. Cooper*, of Kansas Department of Revenue, for appellee.

Before ISHERWOOD, P.J., GREEN and BRUNS, JJ.

PER CURIAM: Stacy Jean Gomez appeals the district court's decision to uphold the suspension of her driving privileges following her arrest for driving under the influence of alcohol. On appeal, Gomez contends that the sheriff's deputy who arrested her failed to properly serve the notice of suspension as required by K.S.A. 2020 Supp. 8-1002(c). In addition, Gomez contends that the officer did not have probable cause to arrest her. However, based on our review of the record on appeal, we find that the district court did not err in upholding the suspension of Gomez' driving privileges under the circumstances presented. Thus, for the reasons stated in this opinion, we affirm the district court's decision.

1

FACTS

Around 1:45 a.m. on the morning of December 2, 2018, Shawnee County Sheriff's Deputy Paul Fernkopf observed a vehicle exiting the parking lot of a bar. Deputy Fernkopf noticed that the driver failed to signal as the car left a roundabout to merge onto an adjoining street. Shortly thereafter, the deputy also saw that the driver of the vehicle— who was later identified to be Gomez—failed to signal when changing lanes. In addition, the deputy observed that the vehicle's tag light was out.

Deputy Fernkopf activated his emergency lights and stopped the vehicle. When the deputy approached the vehicle and identified himself, Gomez did not respond. The deputy smelled the odor of alcohol on Gomez. Once Gomez spoke, the deputy noticed that her speech was slurred. In addition, he observed that Gomez had watery and bloodshot eyes. Deputy Fernkopf asked the driver if she had been drinking, and she admitted that she had.

After running her driver's license, Deputy Fernkopf returned to Gomez' vehicle. He asked her how many drinks she had that evening. She responded by saying that "I've probably honestly had too many." The deputy asked her how many she thought was too many and Gomez said, "three." He then asked, "in the last hour?" and she responded, "I drink Michelob Ultra, I don't know." Deputy Fernkopf asked her, "so you've had three Michelob Ultras tonight?" In response, Gomez said, "no, I've had more than three."

Deputy Fernkopf told Gomez he wanted to conduct some tests to see if it was safe for her to drive. She asked if she could just do the "blow test" or if he could take her home. According to Gomez, she was not comfortable performing the tests on the street because it would be embarrassing. In particular, she was concerned that people she knew might drive by and see her. In addition, Gomez told the deputy that she did not want to do the tests at her house because her children were home.

2

Deputy Fernkopf asked Gomez if she would lie to do the tests in a nearby church parking lot. In response, she said "sure, that's fine." As a result, Deputy Fernkopf drove Gomez to the church parking lot—which was about a minute away from the location of the traffic stop—to administer the field sobriety tests.

In performing the walk-and-turn test, Gomez stepped out of her starting stance a few times before beginning to walk. She also had difficulty following directions and the deputy repeated his demonstration at least twice. Gomez said, "about face!" while turning and took a large pivot step rather than following the direction to make a series of small steps to turn. In his narrative report, Deputy Fernkopf noted that he observed five of the eight clues of possible impairment during the walk-and-turn test. However, he subsequently testified that he observed all eight clues but was trying to give Gomez the benefit of the doubt.

Deputy Fernkopf also had Gomez perform the one-leg-stand test. Before doing so, he provided Gomez with instructions and demonstrated the test for her. In his report, Deputy Fernkopf noted that he observed all four clues of impairment as Gomez unsuccessfully attempted to complete the one-leg-stand test.

Based on the results of the field sobriety tests, Deputy Fernkopf administered a preliminary breath test to Gomez in the backseat of the patrol vehicle. The test results revealed that she had a breath alcohol level of 0.152. At that point, Deputy Fernkopf drove her to the law enforcement center for further testing. According to Deputy Fernkopf, he placed an implied consent advisory form laying flat on the desk in front of Gomez. He then pointed to where he was reading from and read the form to her.

After Deputy Fernkopf read the implied consent advisory to Gomez, she agreed to take a breath alcohol test. Although her first attempt revealed a "deficient sample," her second attempt revealed an alcohol content of 0.194. The deputy then filled out a DC-27

form and reviewed it with Gomez. He also told her that the DC-27 form would serve as her temporary driver's license and informed her that she had 30 days to contact the administrative hearing office regarding the suspension of her driver's license. The deputy folded the DC-27 form, a copy of the implied consent advisory form, and a copy of her second test result together. He then placed the documents on the desk in front of Gomez and indicated that the paperwork would be put with her property at the jail. Thereafter, Deputy Fernkopf took her to the jail and gave the DC-27 form and other paperwork to a corrections officer to keep with Gomez' property. It is undisputed that Gomez received the DC-27 form upon her release from jail.

Gomez' attorney timely requested an administrative hearing to challenge the suspension of her driver's license. Following a hearing, an administrative hearing officer affirmed the suspension of Gomez' driving privileges. Subsequently, Gomez' attorney filed a timely petition for judicial review with the district court. On October 21, 2020, the district court held an evidentiary hearing at which Deputy Fernkopf, Gomez, and an expert witness retained by Gomez on the subject of DUI enforcement testified. After taking the matter under advisement, the district court upheld the administrative suspension in a 22-page memorandum opinion entered on November 12, 2020.

ANALYSIS

On appeal, Gomez contends that the district court erred in upholding the suspension of her driving privileges. Gomez argues that Deputy Fernkopf failed to properly serve the DC-27 form on her. In addition, Gomez contends that the deputy did not have probable cause to arrest her prior to conducting the field sobriety tests.

We review the district court's decision to uphold the administrative suspension of Gomez' driver's license under the provisions of the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. *Rosendahl v. Kansas Dept. of Revenue*, 310 Kan. 474, 480, 447

4

P.3d 347 (2019). Pursuant to the KJRA, we review the district court's factual findings for substantial competent evidence while our review of its legal conclusions is unlimited. *Creecy v. Kansas Dept. of Revenue*, 310 Kan. 454, 466, 447 P.3d 959 (2019). On appeal, the burden of proving the invalidity of the agency action rests on the party—in this case Gomez—who is challenging the action. K.S.A. 77-621(a)(1).

*Service of the DC-27 Form*

First, Gomez contends that she was not personally served with the DC-27 form in strict compliance with K.S.A. 2020 Supp. 8-1002(c). Although this issue is fact-dependent, the ultimate question regarding the adequacy of an arresting officer's service of a DC-27 form is one of law over which our review is unlimited. Likewise, statutory interpretation presents a question of law over which we have unlimited review. *In re Joint Application of Westar Energy and Kansas Gas and Electric Co.*, 311 Kan. 320, 328, 460 P.3d 821 (2020).

In its comprehensive memorandum decision and order, the district court made the following relevant factual findings and legal conclusions:

"K.S.A. 8-1002(c) says that in the case of a test failure, when an officer completes a DC-27 form and the licensee is still in custody, service of the DC-27 'shall be made in person by the officer on behalf of the division of vehicles.' Gomez argues that that the law requires strict compliance with the personal service requirement, and because she was not personally served with the DC-27 form, her suspension must be reversed.

"Deputy Fernkopf completed the DC-27 on the desk in front of him near where Gomez was sitting. He placed it in front of her, told her it was her temporary driver's license, and circled the address to indicate to her the contact information to request an administrative hearing. He told Gomez she had 30 days to request a hearing, but this was in error. A licensee who has been served an officer's certification and notice of

suspension pursuant to K.S.A. 8-1002 may request an administrative hearing 14 days after service of the notice. K.S.A. 8-1020(a).

"Because Gomez was still in handcuffs, Deputy Fernkopf folded the DC-27 and told Gomez the paper would be put with her property at the jail. The video shows that when Deputy Fernkopf transported Gomez to the jail, he gave the DC-27 to the jailer to place with Gomez's property. Later, Gomez timely requested and received an administrative hearing, all with assistance of counsel. She testified at trial that she was not prejudiced by Deputy Fernkopf's method of service of the DC-27.

"In *Snyder v. Kansas Dep't of Revenue*, 2011 WL 1196917, *3 (Kan. App. 2011) (unpublished), the appellate court said substantial compliance with the personal service requirement was sufficient. With facts very similar to those at hand, the court said:

'Trooper Bradley discussed the DC-27 with Snyder at the police station and, with Snyder's knowledge, placed it in the basket containing Snyder's personal effects. Snyder does not dispute that he received the DC-27 in a timely fashion. Snyder pursued an administrative appeal as he was informed in the DC-27 that he had a right to do. Snyder was fully informed of his appeal rights and suffered no prejudice by having the DC-27 placed with his personal affects. We conclude that Trooper Bradley substantially complied with the requirement for personal service.' *Id.*

"In *Kugler v. Kansas Dept. of Revenue*, 2012 WL 2045379, *4 (Kan. App. 2012) (unpublished) with similar facts, the appellate court concluded that substantial compliance was sufficient, and if the officer placed a copy of the DC-27 with the licensee's belongings before that person was booked into jail, then the officer substantially complied with the service requirements in K.S.A. 8-1002(c). See also *Fraser v. Kansas Dept. of Revenue*, 2014 WL 7152337, *6 (Kan. App. 2014) (unpublished) (same); and *Pappan v. Kansas Dept. of Revenue*, 2016 WL 1545650 (Kan. App. 2016) (unpublished) (same).

"Gomez argues that strict compliance is required for personal service of the DC-27, citing *Anderson v. Kansas Dept. of Revenue*, 18 Kan. App. 2d 347, 355, 853 P.2d 69

6

(1993) (in Kansas 'a "bright line" rule requires strict adherence to the legislative mandate of personal service.'). But later panels of the Court of Appeals rejected the reasoning in *Anderson* given subsequent legislative changes, including what is now K.S.A. 8-1001(u) (implied consent statute 'is remedial law and shall be liberally construed to promote public health, safety and welfare.'). The Kansas Supreme Court has thus far declined to decide the question of strict versus substantial compliance in regard to K.S.A. 8-1002(c). See *Creecy v. Kansas Dept. of Revenue*, 310 Kan. 454, 468, 447 P.3d 959 (2019).

"Absent direction to the contrary from the Kansas Supreme Court, this Court chooses to follow the reasoning of the panels in *Snyder*, *Kugler*, *Fraser*, and the like. Substantial compliance with K.S.A. 8-1002(c) is sufficient. Deputy Fernkopf reviewed the DC-27 with Gomez, told her he would place it with her personal property at the jail, and did as he promised. Gomez received the DC-27, hired counsel, and timely requested and received a hearing on her driver's license suspension. The deputy substantially complied with the personal service requirement in the statute."

We agree with the district court's analysis.

The requirements for service of a DC-27—notice of suspension form—are set out in K.S.A. 2020 Supp. 8-1002(c), which states:

"When the officer directing administration of the testing determines that a person has refused a test and the criteria of subsection (a)(1) have been met or determines that a person has failed a test and the criteria of subsection (a)(2) have been met, the officer shall serve upon the person notice of suspension of driving privileges pursuant to K.S.A. 8-1014, and amendments thereto. If the determination is made while the person is still in custody, service shall be made in person by the officer on behalf of the division of vehicles. In cases where a test failure is established by a subsequent analysis of a breath, blood or urine sample, the officer shall serve notice of such suspension in person or by another designated officer or by mailing the notice to the person at the address provided at the time of the test."

7

In addition, the Kansas Supreme Court has found that the service requirements of the Kansas Code of Civil Procedure apply to the application of K.S.A. 2020 Supp. 8-1020. See *Creecy*, 310 Kan. at 467. As a result, personal service of a DC-27 form is defined in accordance with K.S.A. 2020 Supp. 60-303(d)(1)(A), which requires the "delivering or offering to deliver a copy of the process and petition or other document to the person to be served." See *Creecy*, 310 Kan. at 467. Like the district court, we find that Deputy Fernkopf met the statutory service requirements.

In fact, the service of the DC-27 form by Deputy Fernkopf on Gomez was substantially identical to the service in *Creecy*, which was approved by our Supreme Court. 310 Kan. at 468. In *Creecy*, the arresting officer completed a DC-27 form, presented it to the driver, and told him that he would place the form with his property at the jail. On appeal, our Supreme Court found that the arresting officer had complied with the statutory requirements for service of the DC-27 form. Further, it found that the placement of the form with the driver's personal belongings in the jail did not render the service to be ineffective. 310 Kan. at 468; see also *Meats v. Kansas Dept. of Revenue*, 310 Kan. 447, 452-53, 447 P.3d 980 (2019).

Here, it is undisputed that Deputy Fernkopf placed the signed DC-27 form in front of Gomez and explained that the form would serve as her temporary license. In addition, the deputy advised Gomez of her right to request an administrative hearing and circled this information on the form. He also told Gomez that he would place the DC-27 form and the other paperwork with her personal belongings at the jail. Significantly, Gomez does not dispute the fact that the DC-27 form was with her belongings when she was released from jail. She also does not dispute that her attorney was able to timely challenge the administrative suspension of her driver's license. Consequently, we conclude that the service of the DC-27 form on Gomez by Deputy Fernkopf was adequate under the circumstances presented.

We also agree with the district court's well-reasoned analysis regarding substantial compliance. K.S.A. 2020 Supp. 8-1001(u) states that the law regarding the administrative suspension of driver's licenses is "remedial" in nature and it "shall be liberally construed to promote public health, safety and welfare." As the district court properly noted, numerous panels of our court have concluded that this statutory language clearly reflects the intent of the Kansas Legislature that strict compliance is not necessary in regard to the service requirements of K.S.A. 2020 Supp. 8-1002(c). See *Byrd v. Kansas Dept. of Revenue*, 43 Kan. App. 2d 145, 153-55, 221 P.3d 1168 (Kan. App. 2010); *Pappan v. Kansas Dept. of Revenue*, No. 112,677, 2016 WL 1545650, at *5-7 (Kan. App. 2016) (unpublished opinion); *Fraser v. Kansas Dept. of Revenue*, No. 110,817, 2014 WL 7152337, at *5-7 (Kan. App. 2014) (unpublished opinion); *Kugler v. Kansas Dept. of Revenue*, No. 106,410, 2012 WL 2045379, at *2-4 (Kan. App. 2012) (unpublished opinion); *Snyder v. Kansas Dept. of Revenue*, No. 103,767, 2011 WL 1196917, at *2-3 (Kan. App. 2011) (unpublished opinion).

We also find it to be significant—as did the district court—that Gomez testified at the evidentiary hearing that she was not prejudiced by the arresting officer's method of serving the DC-27 form because she was able to timely request an administrative hearing to challenge the suspension of her driver's license. See *Creecy*, 310 Kan. at 468 (finding that assertions of inadequate notice were "simply unavailing" where the driver had successfully used the DC-27 form to timely request an administrative hearing); see also *Byrd*, 43 Kan. App. 2d at 154-55 (finding that the use of a DC-27 form to timely request an administrative hearing demonstrated that no prejudice resulted from the alleged improper service).

*Probable Cause for Arrest*

Second, Gomez contends that Deputy Fernkopf did not have probable cause to arrest her at the time she was taken in his patrol vehicle to a nearby church parking lot to

9

complete the field sobriety tests. However, based on our review of the record on appeal, we find that the district court correctly concluded that the deputy did have probable cause to arrest Gomez prior to conducting the tests. Specifically, we conclude that the district court's findings on this issue are supported by evidence that is substantial when viewed in light of the record as a whole. See K.S.A. 77-621(c)(7), (d); see also *Swank v. Kansas Dept. of Revenue*, 294 Kan. 871, 881, 281 P.3d 135 (2012).

In this regard, we find the district court's thorough discussion regarding this issue to be instructive. Specifically, the district court made the following relevant factual findings and legal conclusions:

"'[O]n judicial review under K.S.A. 2019 Supp. 8-1020(p), a court may consider any constitutional issue, including the lawfulness of the law enforcement encounter. And under K.S.A. 2019 Supp. 8-1020(q) a court may set aside a driver's license suspension order if the driver meets the burden of establishing the encounter was unlawful.' *Jarvis v. Dep't of Revenue*, 2020 WL 5996446, *9 (Kan. 2020). Gomez does not challenge the stop of her vehicle. Rather, she challenges the legality of her arrest and argues that this is grounds to reverse her driver's license suspension.

"In order to be lawful, an arrest must be supported by probable cause. *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, 20, 290 P.3d 555 (2012). Probable cause is defined as follows:

"'Probable cause is the reasonable belief that a specific crime has been or is being committed and that the defendant committed the crime. Existence of probable cause must be determined by consideration of the information and fair inferences therefrom, known to the officer at the time of the arrest. Probable cause is determined by evaluating the totality of the circumstances. As in other totality of the circumstances tests, there is no rigid application of factors and courts should not merely count the facts or factors that support one side of the determination or the other.' (Internal citations and quotations omitted.) *Id*.

"Gomez asserts that the point of arrest occurred when Deputy Fernkopf placed her in his patrol car to drive her to a nearby church to perform the field sobriety tests, and he did not have probable cause to arrest her at that point. The first question is whether Gomez was under arrest when Deputy Fernkopf took her to the church. 'Pursuant to statute, a person is considered to be under arrest when he or she is physically restrained or when he or she submits to the officer's custody for the purpose of answering for the commission of a crime. K.S.A. 22-2202(4); K.S.A. 22-2405(1).' *State v. Hill*, 281 Kan. 136, 143, 130 P.3d 1 (2006). Deputy Fernkopf testified that Gomez was not free to leave at the point when he placed her in his patrol car to drive to the church. Gomez testified that she did not feel free to leave and was submitting to the deputy's direction. Under these facts, Gomez was under arrest at that point.

"That does not mean Deputy Fernkopf was required to stop his investigation and forego field sobriety tests or a PBT. See *Homeier v. Kansas Dept. of Revenue*, 2018 WL 2073518, *3 (Kan. App. 2018) (unpublished) ('We know of no Kansas law that requires an officer to immediately interrupt an investigation and arrest a defendant once the probable cause threshold is met.') But it does mean that the legality of the arrest must be evaluated according to the information known to Deputy Fernkopf at that point in time.

"Thus, the second question is whether Deputy Fernkopf had probable cause to arrest Gomez when he placed her in his patrol car to drive to the church. At that point in time, Deputy Fernkopf had stopped Gomez after she left a bar at approximately 1:45 a.m. Further, he had observed the following: Gomez's failure to change lanes twice while driving; her reticence to speak to him when he first approached her car; the odor of alcohol when she did speak to him; her watery and bloodshot eyes; her slurred and at times confused speech; her repeated admission to consuming alcohol, specifically more than three Michelob Ultras; and her admission that she had 'too many' drinks.

"Gomez relies mostly on *City of Norton v. Wonderly*, 38 Kan. App. 2d 797, 172 P.3d 1205, *rev. denied* 286 Kan. 1176 (2008), a criminal case. There, the appellate court found no probable cause for Wonderly's arrest for driving under the influence. The officer did not observe any traffic violations, but he stopped Wonderly's truck based upon a phone call from a motorist who indicated Wonderly had exhibited erratic driving. Wonderly stopped his truck in a normal manner, but when he exited the vehicle the

11

officer had to tell him twice to get back inside. The officer detected the odor of alcohol, but he could not tell whether the odor came from Wonderly, his passengers, or the truck itself. Wonderly had bloodshot eyes, but he produced his driver's license without incident. The officer asked Wonderly to step out of his truck. Wonderly, who exhibited no problems walking, proceeded to the patrol car and sat down inside as instructed. The officer asked Wonderly if he had consumed alcohol, and Wonderly said he had some drinks at a local bar earlier that evening and one or two drinks at another bar. Wonderly's speech was not slurred. *Id*. at 800.

"Because the weather was bad and the officer wanted to continue his investigation, he took Wonderly to the sheriff's office to perform field sobriety tests. The Kansas Court of Appeals held that this was the point of arrest, even though the officer formally arrested Wonderly later. The Court also held that the limited evidence the officer had gathered at the scene was insufficient to support a finding of probable cause for the arrest. *Id*. at 801, 804-09.

"The instant facts are distinguishable. Here, Deputy Fernkopf observed Gomez fail to use her turn signal twice. Deputy Fernkopf smelled alcohol when he spoke to Gomez while she was still in her car. She had no passengers. There was no testimony indicating a question about whether the alcohol smell originated with Gomez. Gomez's speech was slurred. Gomez not only admitted to drinking more than three Michelob Ultras, but admitted that she 'probably honestly had too many.' The evidence here includes several more facts supporting probable cause than were present in *Wonderly*.

"Gomez also points to *Shepack v. Kansas Department of Revenue*, 2018 WL 2373232 (Kan. App. 2018) (unpublished). There, the facts relating to the issue of probable cause to arrest were that the law enforcement officer saw Shepack drift between the left and right lanes several times before the stop, he smelled alcohol on Shepack, and observed bloodshot, watery, and glazed eyes. The officer saw a box of unopened wine bottles in the back of Shepack's truck. Shepack denied drinking. He did not have slurred speech or balance problems. His demeanor was calm. Under these facts, the appellate court affirmed that there was not probable cause to arrest Shepack for DUI. *Id*. at *2-3.

12

"Again, the instant facts are distinguishable. Gomez admitted to drinking more than three beers. She admitted that she had 'too many.' The testimony at trial and the video indicate that Gomez had slurred speech. Deputy Fernkopf said her hesitation to speak to him when he first approached the vehicle was 'awkward' and 'unusual.' After viewing the video, the Court agrees that Gomez's demeanor was odd and at times she seemed confused. The evidence here includes several more facts supporting probable cause than were present in *Shepack*.

"KDOR compares the facts of this case to *Homeier*. There, the facts relating to the issue of probable cause to arrest were that, in the early morning hours, the law enforcement officer saw Homeier speeding on two occasions by less than 10 miles per hour over the posted speed limit. The officer smelled alcohol, Homeier slurred his speech, and his eyes were glassy and bloodshot. Homeier had difficulty exiting the vehicle and had poor balance. Homeier said it had been 'a while' since he consumed alcohol. 2018 WL 2073518, *1. The appellate court affirmed that the officer had probable cause to arrest Homeier for DUI.

"The *Homeier* facts are similar to the ones in the instant case, except that Gomez did not have difficulty getting out of her car and she did not exhibit poor balance when doing so. On the other hand, Gomez admitted to drinking more than three Michelob Ultras, she admitted to drinking 'too many,' and her behavior in not speaking to the deputy at first was 'unusual.' The evidence here includes more factors supporting probable cause than were present in *Homeier*.

"The Court in reviewing various appellate decisions cannot find a perfect factual match for the instant case. Indeed, none exists. The probable cause determination is fact intensive; it must be made in each case considering the totality of unique circumstances present in the particular case before the Court.

"Here, Deputy Fernkopf had stopped Gomez after she left a bar at approximately 1:45 a.m. Further, he had observed the following: Gomez's failure to change lanes twice while driving; her reticence to speak to him when he first approached her car; the odor of alcohol when she did speak to him; her watery and bloodshot eyes; her slurred and at times confused speech; her repeated admission to consuming alcohol, specifically more

13

than three Michelob Ultras; and her admission that she had 'too many' drinks. The facts are sufficient to establish probable cause to arrest Gomez for DUI. Gomez points to the fact that she was cooperative during the encounter, she was able to produce her license and registration without significant difficulty, and she had no balance issues when getting out of the car or walking to the patrol car. These facts are not enough to change the Court's conclusion considering all of the circumstances. Under the totality of the circumstances present at the time of Gomez's point of arrest as determined above, the Court concludes that there was probable cause to arrest her for driving under the influence. Her arrest was lawful."

Again, we agree with the district court's analysis.

We also note that the district court's findings and conclusions are consistent with several decisions issued by our court. For instance, in *Campbell v. Kansas Dept. of Revenue*, 25 Kan. App. 2d 430, 431-32, 962 P.2d 1150 (1998), a panel of our court affirmed a finding of probable cause for arrest prior to the officer conducting field sobriety tests based on the arresting officer's observations that the defendant was speeding, smelled of alcohol, had glazed and bloodshot eyes, and admitted to having a few drinks. Similarly, in *Stejskal v. Kansas Dept. of Revenue*, No. 109,151, 2013 WL 6165284, at *4-5 (Kan. App. 2013) (unpublished opinion), another panel affirmed a finding of probable cause for arrest prior to the officer transporting the defendant to another location to conduct field sobriety tests based on the arresting officer's observations that the defendant was speeding, smelled of alcohol, had slurred speech, and admitted drinking.

Like the district court, we find it to be significant that Deputy Fernkopf observed several signs of intoxication prior to transporting Gomez to the church parking lot in his patrol vehicle to conduct the field sobriety tests. These signs included: leaving a bar and driving erratically, smelling like alcohol, having slurred speech, and admitting to drinking

14

"too many" Michelob Ultras. Accordingly, we conclude that Deputy Fernkopf had probable cause to arrest Gomez prior to conducting the field sobriety tests.

We recognize that the deputy testified that he did not think he had probable cause to arrest Gomez at the time he transported her to the nearby church parking lot to conduct the field sobriety tests. Nevertheless, it is the district court that is charged with the duty of weighing the evidence. On appeal, we do not reweigh the evidence, assess the credibility of witnesses, or resolve evidentiary conflicts. See K.S.A. 77-621(d) ("In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review."); *Auten v. Kansas Corporation Commission*, 27 Kan. App. 2d 252, 254, 3 P.3d 86 (2000) (the Court of Appeals exercises the same review of an administrative agency's decision as the district court). Based on our review of the record, we find that the district court carefully considered and weighed all the evidence presented by the parties at the evidentiary hearing and properly applied it to the law and to the facts. As discussed above, we also conclude that the district court's findings of fact are supported by substantial competent evidence when the record is reviewed as a whole.

A review of the record reveals that evidence was presented at the evidentiary hearing to establish that Gomez was observed leaving a bar, that she was driving erratically, that the smell of alcohol came from her vehicle, that her speech was slurred, that her eyes were watery and blood shot, and that she admitted to drinking "too many"—more than three—Michelob Ultras prior to Deputy Fernkopf transporting her to conduct the field sobriety tests. Further, evidence was presented that the deputy only transported Gomez to the church parking lot because of potentially unsafe conditions at the location of the stop, such as a dangerously narrow shoulder, an improper grade, and falling rain, and because Gomez asked to go somewhere else to avoid the embarrassment of having her friends drive by while she was performing the tests.

15

In sum, we conclude that there is substantial competent evidence in the record when viewed as a whole to support the district court's factual findings. We also conclude that the district court's legal conclusions were appropriate. For these reasons, we affirm the district court's decision.

Affirmed.